January 17. 2024

NOTICE FOR ALL CONCERNED

*1-24- cv- 20 RH/ZCB* (handwritten)

THE COPIES OF EVIDENCE INVOLVED HERE ARE ATTACHED...

COLLIER COUNTY POLICE REPORT

DIGITAL FORENSICS RESULTS

ATTORNEY WARNING LETTER

FTC AFFADAVIT

BUSINESS IDENTITY THEFT

PROOF OF OUR ONLY ADDRESS

WHEN MAILING US BACK BE CERTAIN YOUR REPLY **ONLY** GOES AND IS SENT TO

150301 Cortona Way

Naples, FL 34120 (Private Residence)

**The perpetrators are using the following addresses for** _**Mirrorphoto Productions LLC**_

**Facetime Entertainment, Face Five, Dolly Madison, LLC,** _**FenwoodMedia, MissMileyRose**_

_**MyChamberStreet**_

**15101 Cortona Way   WRONG**

**Naples, Florida**

**Or**

**6230 Wilshire Blvd.    WRONG**

**Los Angeles, CA 90048**

**Or**

**6245 Wilshire Blvd. #908   WRONG**

**Los Angeles CA 90048**


**Or 10859 Kling Street    WRONG**

**West Hollywood, CA**


DO NOT ALLOW any Important Mail to be re-routed to what the perpetrator of these crimes is doing with our mail.

Thank you

**Use NO EMAIL**

**Use NO CELL Phone**

Thank you.

**Margaret & Joseph Tortoriello**

**15301 Cortona Way**

**Naples, FL 34120**

**(ONLY)**

**Landline 239-3161421**

Thank You.
Margaret A. Tortoriello

January 17. 2024

.

NOTICE FOR ALL CONCERNED

THE COPIES OF EVIDENCE INVOLVED HERE ARE ATTACHED...

COLLIER COUNTY POLICE REPORT

DIGITAL FORENSICS RESULTS

ATTORNEY WARNING LETTER

FTC AFFADAVIT

BUSINESS IDENTITY THEFT

PROOF OF OUR ONLY ADDRESS

WHEN MAILING US BACK BE CERTAIN YOUR REPLY **ONLY** GOES AND IS SENT TO

150301 Cortona Way

Naples, FL 34120 (Private Residence)

**The perpetrators are using the following addresses for _Mirrorphoto Productions LLC_**

**Facetime Entertainment, Face Five, Dolly Madison, LLC, _FenwoodMedia, MissMileyRose_**

**_MyChamberStreet_**

**15101 Cortona Way   WRONG**

**Naples, Florida**

**Or**

**6230 Wilshire Blvd.    WRONG**

**Los Angeles, CA 90048**

**Or**

**6245 Wilshire Blvd. #908    WRONG**

**Los Angeles CA 90048**

**Or 10859 Kling Street    WRONG**

**West Hollywood, CA**

DO NOT ALLOW any Important Mail to be re-routed to what the perpetrator of these crimes is doing with our mail.

Thank you

**Use NO EMAIL**

**Use NO CELL Phone**

Thank you.

**Margaret & Joseph Tortoriello**

**15301 Cortona Way**

**Naples, FL 34120**

**(ONLY)**

**Landline 239-3161421**

only

all of my physical mail seems to be re-rated to Los Angeles.

January 17. 2024

NOTICE FOR ALL CONCERNED

THE COPIES OF EVIDENCE INVOLVED HERE ARE ATTACHED...

COLLIER COUNTY POLICE REPORT

DIGITAL FORENSICS RESULTS

ATTORNEY WARNING LETTER

FTC AFFADAVIT

BUSINESS IDENTITY THEFT

PROOF OF OUR ONLY ADDRESS

WHEN MAILING US BACK BE CERTAIN YOUR REPLY **ONLY** GOES AND IS SENT TO

150301 Cortona Way

Naples, FL 34120 (Private Residence)

**The perpetrators are using the following addresses for _Mirrorphoto Productions LLC_**

**Facetime Entertainment, Face Five, Dolly Madison, LLC, _FenwoodMedia, MissMileyRose_**

**_MyChamberStreet_**

**15101 Cortona Way   WRONG**

**Naples, Florida**

**Or**

**6230 Wilshire Blvd.     WRONG**

**Los Angeles, CA 90048**

**Or**

**6245 Wilshire Blvd. #908    WRONG**

**Los Angeles CA 90048**

**Or 10859 Kling Street    WRONG**

**West Hollywood, CA**

DO NOT ALLOW any Important Mail to be re-routed to what the perpetrator of these crimes is doing with our mail.

Thank you

**Use NO EMAIL**

**Use NO CELL Phone**

Thank you.

**Margaret & Joseph Tortoriello**

**15301 Cortona Way**

**Naples, FL 34120**

**(ONLY)**

**Landline 239-3161421**

*Please do not allow anyone to re-rate physice my mail to California !*

*is ar only address since August 2019.*

```
                MARGARET & JOSEPH TORTORIELLO
                15301 CORTONA WAY
                NAPLES, FL. 34120
```

TO:

NORTHERN DISTRICT COURT"
FLORIDA

401 SE First Avenue
Gainsville, FL. 32601

USTPO

1627 I Street NW
Washington, DC

Re: Impersonation
in Courts
+ Trademark
Theft

Dear Administrator:

We are victims of Identity Theft felonies, fraud
and impersonation.

The suspect(s) have also stolen our LLC - Mirrorphoto
Productions which owns Facetime Entertainment Face Five
and Facetime Five. (Attorney letter is attached) as to
confirm that fact.

We have suspicision that our Company Name was
changed and our own names have been changed in order for
the perpetrator to continue on in various courts to get
and retain conservetorship/receivership/guardianship.

All in an effort to carry on with the greed over the 5 plus
years of forgery, theft, impersonation, fradulent
accounts and more.

When this case just arrived to us without explant
explanation, we became suspect as to the merit of the
case and of course, if it has anything to do with our
enormous thefts of all of our savings ($1.5 million)
all of our insurance policies - Met Life, StillWater, and AIG
along with the theft of Mirrorphoto Productions LLC forged
on 09/06/2018. The forgery was made by a Rosemary Gagliardi?

      and illegally turned into a 501 (C). We do not know
      what happened from that point but per our
      attorney's attached letter Mirrorphoto Productions
      owns Facetime Entertainment, Facetime Five, Face Five.
      All are domains to the parent LLC -
      Mirrorphto Productions. The trademark of Mirrorphoto
      was stolen as well in order to remove the category of video/
      television.

continued.....


Video/Television was exactly what our Mirrorphoto had invested
to quite a degree in 2018 having 60 plus tv shows, all edited  paid
for in full and then per the digital forensics you can
see the removal June 26th 2018 directly after firing Justyn
Michael Richards (work ⁙⁙⁙⁙⁙⁙⁙ ) was fired one week
prior.

We have knowledge that he and his pals distributed the 60
complete tv shows of FACE FIVE worldwide on absolutely
every cable channel, streaming services and Facebook Lite,
Youtube and more.

The suspect also made a "deal" "as me" and sold the videos I
own to Vimeo for re-sale.

Google Ads was used to earn money,.

And, the perpetrator moved right into my IP in Naples,
Florida to distribute child pornography!!

He took away any all rights to have a private Email,
He has fradulent accounts (business) with Verizon,
Comcast under dolly Madison LLC and Bellport Productions
Alignable, and more.

More than 6 years tax (business returns) have been filed "as
us" and we do not hear back from the IRS.

We have sent many letters, a 1409B several times and
actually went to the IRS office closest to us in
Ft. Meyers.

The tax years fradulent would be 2018, 2019, 2020, 2021
2022, 2023.

Now, I cannot find one prosecutor to take his case
and I understand I do not have the right to demand
a traial but I can demand that federal law enforcement stop
the harrassement, hackging et a military grade, stop the
abuses of denying us freedom of a phone or cell and freedom
of cable??

No one has stopped them and it needs to begin in my home
by the correct techniciñan/engineer who can get rid of
more than 13-16 devices I have on my wifi??

All I have is a typewriter, The cell phone of
239-380-2277 is a motorla edge 2021 and is our daughter's
name - Tracey McCray, yet I see all the hacking, git hub,
stack flow Barracuda, Gartner Magic Quadrant, Cisco
servers and more because this has gone on so very long
without anyone rescuing us.

continued....

Page 3.


The credit bureaus in 5 years have not corrected our credit reports?

Mail has been diverted over and over again.

I am tracked by person. And my geo-location is always known to my perpetrator

A fradulent guardianship has been taken out on my wife by hacking into her medical files and altering the facts deeming her incompetent and this was to gain conservertship/ guardianship and receiver?

Cases 3:20-cv-02824-TSH
Case
1:23-cv-08960 seem to have nothing to do with us?

Why then, did we rec3eive

Why then, did we receive such obscure documents?

Names and company names could have been changed. This fraud has gone on a very long time.

We are held hostage to it.

I have attached what we feel is necessary for you to investigate and kindly circle back to us via mail.

You may use our only home address of
15301 Cortona Way
Naples, FL 34120

Respectfully yours,
Margaret R. Tutorillo

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

In re: Administrative Orders of the Chief Judge      Case No. 3:21-mc-1-TJC

## ORDER SUNSETTING
## STANDING ORDER ON
## MANAGEMENT OF SOCIAL SECURITY CASES

In light of the Federal Rules of Civil Procedure Supplemental Rules for Social Security Actions Under 42 U.S.C. § 405(g), which will become effective on December 1, 2022, the Court's previous Standing Order on Management of Social Security Cases (Doc. 43) will terminate and not be applicable to any social security cases filed on or after **December 1, 2022**.

**DONE AND ORDERED** in Jacksonville, Florida this 22nd day of November, 2022.

*Timothy J. Corrigan*
TIMOTHY J. CORRIGAN
Chief United States District Judge

efiling @ brennard.
org.

1    Plaintiff Lincoln Network, Inc. ("Lincoln Network" or "Plaintiff") brings
2    this class action complaint on behalf of itself and those similarly situated
3    (collectively, "Plaintiffs") against Defendants PNC Financial Services Group, Inc.
4    ("PNC FSG") and PNC Bank, National Association ("PNC Bank") (collectively,
5    "PNC" or "Defendants"). Plaintiff alleges the following based upon its information
6    and belief and the investigation of its counsel and personal knowledge as to the
7    allegations pertaining to it.

8    **I.    INTRODUCTION**

9        1.    Defendant PNC Bank has exploited the Coronavirus crisis to line its
10   pockets with hundreds of millions of taxpayer dollars while compounding the
11   economic hardship suffered by small businesses and independent contractors—
12   "hardworking Americans and businesses that, through no fault of their own, have
13   been adversely impacted by the coronavirus outbreak," according to U.S. Treasury
14   Secretary Steven Mnuchin.

15       2.    The U.S. Small Business Administration ("SBA") Paycheck
16   Protection Program ("PPP") was intended to help "overcome the challenges" of
17   the Coronavirus crisis and "provide a direct incentive to small businesses to keep
18   their workers on the payroll" by providing SBA-guaranteed loans of up to $10
19   million to qualified applicants.[1] Anticipating the massive demand for relief and to
20   ensure non-preferential distribution of funds, the PPP's governing rules required
21   that banks process applications on a "***first-come, first-served***" basis.[2]

22       3.    In violation of these rules, California law, and their fiduciary
23   obligations, Defendants favored their own interests by prioritizing larger loan

24   _____

25   [1] https://www.sba.gov/funding-programs/loans/coronavirus-relief-options/paycheck-protection-program-ppp#section-header-4 (last visited April 22, 2020).

26   [2] https://www.sba.gov/sites/default/files/2020-04/PPP--IFRN%20FINAL_0.pdf (last visited
27   April 22, 2020).

28                          CLASS ACTION COMPLAINT
                                    -2-

1  meant that PNC and other banks did less work to vet applications than for
2  traditional SBA or other loans.

3       7.     PNC FSG recently highlighted its participation in the PPP during its
4  quarterly earnings conference call with analysts and investors on April 15, 2020.
5  During the call, CEO William Demchak claimed the bank was "[h]elping
6  thousands of business customers apply for emergency relief loans," "providing
7  relief to customers," and "[c]ontinuing to provide liquidity to corporate clients."
8  Selected slides accompanying Mr. Demchak's discussion of the bank's business
9  are below:





1   government puts more money in we can submit." On April 18, 2020, PNC claimed
2   without explanation that it was "unable to complete the review and SBA
3   registration process" for Lincoln Network's PPP loan application "before the SBA
4   announced on its website that it is unable to accept new applications for the PPP
5   program because the authorized funding has been fully allocated."

6       11.    At no time did PNC disclose and Plaintiff was unaware that PNC was
7   violating the PPP governing rules by favoring existing PNC customers and
8   applicants seeking larger loans and putting smaller borrowers like Lincoln
9   Network to the back of the queue or not submitting their application at all.

10      12.    As of the date of this Complaint, Plaintiff and other members of the
11  proposed Class have suffered enormous and potentially irreversible damages. For
12  example, unlike those favored by PNC and other big banks, Plaintiff and other
13  Class members have not received funds or approval of their loan applications.
14  Additionally, the delay caused by PNC's misrepresentations and omissions caused
15  hardship, including business cessation, for many applicants who were and are
16  desperately seeking a lifeline through the PPP.

17      13.    Through this litigation, Plaintiff seeks an injunction preventing PNC
18  from continuing its illegal business practices, compensation for the harms caused
19  by misconduct alleged herein, and all other relief that the Court deems appropriate.

20  **II.    THE PARTIES**

21      **A.    Plaintiff**

22      14.    Plaintiff Lincoln Network, Inc. is a 501(c)(3) tax exempt organization
23  incorporated in Delaware with its primary business address at 2443 Fillmore Street,
24  #380-3386, San Francisco, CA 94115.

25      15.    Lincoln Network's mission is to build a community of innovators who
26  embrace technology and educate the public about platforms and policies that
27  advance liberty. In particular, Lincoln Network is dedicated to increasing

28

CLASS ACTION COMPLAINT
-6-

84.    Additionally, Defendants must comply with SBA regulations such as 13 CFR Part 120.140, which states, among other things, that lenders "must act ethically and exhibit good character" that prohibits "engag[ing] in conduct reflecting a lack of business integrity or honesty." 13 CFR Part 120.140(f); *see also* 13 CFR Part 120.140(b), (j)(1), (l).

85.    Defendants' violations of such statutes is negligence per se and was a substantial factor in the harm suffered by Plaintiff and the Class members, including their submission of applications for loans through the PPP with Defendants who violated the "first-come, first-served" basis for processing loan applications, as dictated by the PPP, when they processed larger loans ahead of smaller loans.

86.    As set forth above, such laws were intended to ensure that a company's claims about its services are truthful and accurate and that they engaged in business in an ethically and honest manner.

87.    By virtue of Defendants' negligence, Plaintiff and the Class members have been damaged in an amount to be proven at trial or alternatively, seek rescission and disgorgement under this Count.

## VI.    **DEMAND FOR JURY TRIAL**

88.    Plaintiff demands a trial by jury on all issues so triable.

## VII.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for the following for relief:

1.    Certifying the proposed Class; appointing Plaintiff as Class representative, and its undersigned counsel as Class counsel;

2.    An order requiring Defendants to bear the costs of class notice;

3.     An order enjoining Defendants from administering, processing, or handling loans through the PPP in violation of SBA regulations and requirements or California law;

4.     An order awarding declaratory relief, and any further retrospective or prospective injunctive relief permitted by law or equity, including enjoining Defendants from continuing the unlawful practices as alleged herein, and injunctive relief to remedy Defendants' past conduct;

5.     An order requiring Defendants to disgorge or return all monies, revenues, and profits obtained by means of any wrongful or unlawful act or practice;

6.     An order requiring Defendants to pay punitive damages on any count so allowable;

7.     An order requiring Defendants to pay all statutory damages permitted under the counts alleged herein;

8.     An order awarding attorneys' fees and costs, including the costs of pre-suit investigation, to Plaintiff and the Class members; and

9.     An order providing for all other such equitable relief as may be just and proper.

Date: April 23, 2020                     Respectfully submitted,

                                         BERGER MONTAGUE PC

                                         /s/ Benjamin Galdston
                                         BENJAMIN GALDSTON
                                         12544 High Bluff Drive, Suite 340
                                         San Diego, CA 92130
                                         Tel: (619) 489-0300
                                         Email: bgaldston@bm.net

1
2
3
4
5
6

BRYSON LAW PLLC
Daniel K. Bryson
(*pro hac vice* forthcoming)
PO Box 12638
Raleigh, NC 27605
Tel:  (919) 600-5000
Fax:  (919) 600-5035
Email: dan@whitfieldbryson.com

7
8
9
10
11
12
13
14

LOCKRIDGE GRINDAL NAUEN P.L.L.P.
Robert K. Shelquist
(*pro hac vice* forthcoming)
Rebecca A. Peterson (SBN 241858)
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel.: (612) 339-6900
Fax: (612) 339-0981
Email: rkshelquist@locklaw.com
              rapeterson@locklaw.com

15
16
17
18
19
20
21
22
23
24

GREG COLEMAN LAW PC
Alex R. Straus (SBN 321366)
16748 McCormick Street
Los Angeles, CA 91436
Tel.: (310) 450-9689
Email:  alex@gregcolemanlaw.com
              -and-
Gregory F. Coleman
(*pro hac vice* forthcoming)
First Tennessee Plaza
800 South Gay Street, Suite 100
Knoxville, TN 37929
Tel.: (865) 247-0080
Email: greg@gregcolemanlaw.com

25
26
27

*Attorneys for Plaintiff*
*and the Proposed Class*

28

# ClassAction.org

This complaint is part of ClassAction.org's searchable class action lawsuit database and can be found in this post: Class Action Claims PNC Bank 'Exploited' Coronavirus at Expense of PPP Loan Applicants

## III.    JURISDICTION AND VENUE

20.    The Court has original jurisdiction over this matter under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a class action in which (i) at least some of the members of the proposed Class have different citizenship from the Defendants; (ii) the proposed Class consists of more than 100 persons or entities; and (iii) the claims of the proposed Class members collectively exceed $5 million.

21.    The Court has personal jurisdiction over Defendants because they do business in this District and a substantial number of events giving rise to the claims asserted herein took place in California.

22.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial number of the events giving rise to the claims asserted herein took place in this District.  For example, Plaintiff's principal place of business is located in San Francisco and Defendants marketed, promoted, and received applications for PPP loans within this District. Pursuant to California Civil Code §§ 1770 and1780(d), Plaintiff is filing concurrently with this Complaint an affidavit stating facts showing that this action has been commenced in San Francisco County as a proper place for the trial of the action. *See* Exhibit A.

## IV.    FACTUAL ALLEGATIONS

23.    The Coronavirus Aid, Relief, and Economic Security (CARES) Act, signed into law on March 27, 2020, allocated $349 billion in taxpayer funds to the SBA to make low interest "forgiveable" loans through the PPP to qualifying small businesses, non-profits and independent contractors. Congress enacted the legislation to help keep workers employed and paid amid the Coronavirus pandemic and economic downturn. PPP loans are 100% federally guaranteed; meaning, the banks that originate PPP loans bear no risk unlike loans made using their own funds.

transparent about our balance sheet" and was "well-capitalized and positioned to weather the

bear market." Ehrlich concluded the letter by reminding consumers that their Voyager deposits

were "FDIC insured" and "protected up to $250,000":

> This is also a good time to remind everyone that USD is held by our banking
> partner, Metropolitan Commercial Bank, which is FDIC insured. The cash you
> hold with Voyager is protected up to $250,000–which means it's as safe with us
> as at a bank.



33.    Then, a mere two weeks after Defendant ▮▮▮▮ reassured consumers in June

2022 that Voyager was "well-capitalized and positioned to weather the bear market," Defendants

unilaterally froze consumers' access to their deposits.

34.    Consumers were locked out of accounts that had been earmarked for down

payments for homes, college tuition for their children, and their life savings.  Many noted that

they put their savings into Voyager because they believed their deposits were FDIC insured.

35.    On July 5, 2022, ▮▮▮▮ filed for bankruptcy.  Cash deposits held on Voyager

with MCB were frozen for over a month.  All crypto-assets on the Voyager platform were frozen

indefinitely.

36.    In a letter to the bankruptcy court, one consumer said, "The money that my wife

and I were hoping to use for our young daughter's education in the future is now locked up."

37.    Another consumer recounted that his family had sold their condo and planned to

buy a home when they found out their newborn baby was diagnosed with Respiratory Syncytial

Virus and required a medical procedure.  As he put it, "We thought the USDC was FDIC insured

so we moved all the proceeds from the sale of our home to ▮▮▮▮ for [the] period we took off

the home search to care for our sick child.  It was always our plan to pull the money to purchase

a home . . ."

Wells Fargo ( ? )

## COMMON ENTERPRISE

13.     Defendants ▓▓▓▓▓▓al, LLC, ▓▓▓▓▓▓▓▓▓▓▓s, Inc., and ▓▓▓▓▓

Digital Ltd. (collectively, "Corporate Defendants" or "Voyager") have operated as a common

enterprise while engaging in the deceptive acts and practices and other violations of law alleged

below.  Corporate Defendants have conducted the business practices described below through an

interrelated network of companies that have common ownership, officers, managers, business

functions, employees, and office locations, and that commingled funds and property, including

digital assets.  Because these Corporate Defendants have operated as a common enterprise, each

of them is liable for the acts and practices alleged below.

## COMMERCE

14.     At all times relevant to this Complaint, Defendants have maintained a substantial

course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act,

15 U.S.C. § 44.

## BACKGROUND ON CRYPTOCURRENCY

15.     Cryptocurrencies are digital assets that exist on a technology called a blockchain,

a type of electronic ledger.

16.     There are thousands of different cryptocurrencies, sometimes called "coins" or

"tokens," in existence today.  Common cryptocurrencies include Bitcoin (BTC) and Ethereum

(ETH).  Most cryptocurrencies are not issued or created by any government or centralized

banking institution.

wallet to the platform to be able to purchase or transfer cryptocurrency.

22.    Voyager featured USD Coin prominently on its platform.  Voyager's services
have included an Earn program that promises "rewards" (annual percentage yield or "APY") on
deposits of cryptocurrency assets such as USD Coin; brokerage services that allow consumers to
exchange, buy, or sell cryptocurrencies; and a debit card that allows consumers to make real-
world purchases using USD Coin.

23.    Voyager maintained omnibus consumer depository accounts at Metropolitan
Commercial Bank ("MCB") to store cash deposits from consumers.  MCB also served as the
issuing bank for Voyager's debit card, which required consumers to have USD Coin in their
account to fund purchases in dollars.

## Voyager's Deceptive Claims About FDIC Insurance

24.    Voyager advertised itself as a bank alternative for consumers to store their
cryptocurrency and cash. ▓▓▓▓▓▓▓▓▓▓▓ encouraged consumers to "ditch your bank" and use
▓▓▓▓▓▓ debit card.  To bolster the impression that Voyager was a safe place for consumers to
store their money, Voyager falsely represented that consumer deposits would be "FDIC insured."
Many consumers decided to use ▓▓▓▓▓▓ based on the representation that the company and
consumers' deposits were FDIC insured.

25.    ▓▓▓▓▓▓ made widespread marketing claims to encourage consumers to store
their cryptocurrency, including USD Coin (the primary "stablecoin" on Voyager's platform), and
cash with Voyager, and to convert cash to USD Coin to make purchases using Voyager's debit
card.  In 2019, Voyager declared on its website—under a header stating in large, all caps font,
"YOUR USD IS FDIC INSURED"—that "all customers' USD held with Voyager is now FDIC

insures only deposits held by insured banks or savings associations. Voyager is not a chartered bank or savings association. FDIC insurance does not extend to crypto-assets, such as the USD Coin stored on ████'s platform. Nor did FDIC insurance protect consumers' U.S. dollar deposits against ████'s failure.

30.     FDIC insurance protects cash deposits only in the event of the insured institution's failure. Deposits held at MCB, an FDIC-insured bank, for example, were not protected if Voyager failed. Instead, MCB's FDIC insurance would enable Voyager to recover a limited portion of its losses in the event of MCB's failure.

31.     Defendants were well aware that Voyager was not FDIC insured and that its marketing could lead consumers to believe that Voyager was insured against losses of cryptocurrency. For example, in a November 2021 email exchange between Defendants and Voyager's partner bank MCB, MCB asked Voyager to change how it described FDIC insurance in the terms and conditions for Voyager's debit card, because MCB found the statement that funds in the debit card account would be FDIC insured as "potentially misleading." An MCB representative went on to say that "a reasonable consumer could conclude that his USDC [USD Coin] held with Voyager is FDIC-insured." While Defendants modified the fine print in their cardholder agreement, Defendants did not revise or take down the abovementioned FDIC representations in consumer-facing marketing materials.

32.     On June 14, 2022, shortly before the company declared bankruptcy, ████ consumers received a letter from Defendant Ehrlich attempting to assuage any concerns about the volatility of the crypto market and the failure of other prominent crypto firms. In the letter, Ehrlich stressed that, as a publicly traded company, Voyager goes the "extra mile to be

10

17.     Some cryptocurrencies are known as "stablecoins."  A "stablecoin" is a type of cryptocurrency that purports to be tied or "pegged" to another currency or financial instrument. For example, "USD Coin" attempts to peg its market value 1:1 to the U.S. dollar.

18.     Cryptocurrency companies have invested heavily in marketing in recent years. For example, one cryptocurrency exchange announced a $100 million advertising campaign in 2021, and another spent $20 million for an advertising spot in the 2022 U.S. Super Bowl. Cryptocurrency ads often feature popular celebrities and well-known athletes.  Voyager has followed this trend.  Since 2021, ███████ has featured a former ███ star in its ads and announced a partnership with the ████████████.  Cryptocurrency's marketing efforts have been successful: Roughly three-quarters of those who have ever invested in, traded, or used cryptocurrency say they did so for the first time within the past five years.

19.     As consumer interest in cryptocurrency has risen, so have scams and frauds involving cryptocurrencies.  In 2022 alone, consumers reported over $1.4 billion in losses to cryptocurrency-related scams.  And 2022 saw the total collapse of certain cryptocurrencies, including so-called stablecoins, and popular cryptocurrency exchanges.

## DEFENDANTS' BUSINESS ACTIVITIES

20.     Founded in 2018, ██████████ is a publicly traded cryptocurrency financial services provider that markets a variety of cryptocurrency products and services to consumers throughout the United States.

21.     To sign up for an account and access Voyager's services, consumers must use Voyager's mobile application (███████████).  Once in the ██████████, consumers must provide personal identifying information and link their bank account or off-site cryptocurrency

and email address and telephone number, as designated points of contact, which representatives of the Plaintiffs may use to communicate with Settling Defendant; (b) identify all of that Settling Defendant's businesses by all of their names, telephone numbers, and physical, postal, email, and Internet addresses; (c) describe the activities of each business, including the products and services offered, the means of advertising, marketing, and sales, any use of consumer endorsements, incentives to endorsers, and any connections to any endorsers, including copies of any endorsement where there is any connection to the endorser, and the involvement of any other Defendant (which Individual Settling Defendants must describe if they know or should know due to their own involvement); (d) identify the total dollar amount of all monies paid to each Plaintiff State pursuant this Order; (e) describe in detail whether and how that Settling Defendant is in compliance with each Section of this Order; and (f) provide a copy of each Order Acknowledgment obtained pursuant to this Order, unless previously submitted to the Commission.

2.     Additionally, each Individual Settling Defendant must:  (a) identify all telephone numbers and all physical, postal, email and Internet addresses, including all residences; (b) identify all business activities, including any business for which such Individual Settling Defendant performs services whether as an employee or otherwise and any entity in which such Individual Settling Defendant has any ownership interest; and (c) describe in detail such Individual Settling Defendant's involvement in each such business, including title, role, responsibilities, participation, authority, control, and any ownership.

B.    For 20 years after entry of this Order, each Settling Defendant must submit a compliance notice, sworn under penalty of perjury, within 14 days of any change in the following:

1.    Each Settling Defendant must report any change in: (a) any designated point of contact; or (b) the structure of any Corporate Defendant or any entity that Settling Defendant has any ownership interest in or controls directly or indirectly that may affect compliance obligations arising under this Order, including: creation, merger, sale, or dissolution of the entity or any subsidiary, parent, or affiliate that engages in any acts or practices subject to this Order.

2.    Additionally, each Individual Settling Defendant must report any change in: (a) name, including aliases or fictitious name, or residence address; or (b) title or role in any business activity, including any business for which such Individual Settling Defendant performs services whether as an employee or otherwise and any entity in which such Individual Settling Defendant has any ownership interest, and identify the name, physical address, and any Internet address of the business or entity.

C.    Each Settling Defendant must submit to Plaintiffs notice of the filing of any bankruptcy petition, insolvency proceeding, or similar proceeding by or against such Settling Defendant within 14 days of its filing.

D.    Any submission to Plaintiffs required by this Order to be sworn under penalty of perjury must be true and accurate and comply with 28 U.S.C. § 1746, such as by concluding: "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on: _____" and supplying the date, signatory's full name, title (if applicable), and signature.

16

*INETCO* (handwritten)



# (no subject)

1 message

**Why Me** <mewhy1199@gmail.c
Draft

Fri, Dec 24, 2021 at 3:00 PM

**The financial Hack**

**Transaction Processing Systems**

For most organizations that sell directly to their customers, **transaction processing systems (TPS)** represent a fountain of potentially insightful data. Every time a consumer uses a point-of-sale system, an ATM, or a service desk, there's a **transaction** (some kind of business exchange) occurring, representing an event that's likely worth tracking.

*whats is A Logally Card?* (handwritten)

The cash register is the data generation workhorse of most physical retailers, and the primary source that feeds data to the TPS. But while TPS can generate a lot of bits, it's sometimes tough to match this data with a specific customer. For example, if you pay a retailer in cash, you're likely to remain a mystery to your merchant because your name isn't attached to your money. Grocers and retailers can tie you to cash transactions if they can convince you to use a **loyalty card**. Use one of these cards and you're in effect giving up information about yourself in exchange for some kind of financial incentive. The explosion in retailer cards is directly related to each firm's desire to learn more about you and to turn you into a more loyal and satisfied customer.

*I have no idea what this refers to? I did not write it. M. Tartorillo* (handwritten)



# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

In re: Administrative Orders of the Chief Judge          Case No. 3:21-mc-1-TJC

## ORDER SUNSETTING
## STANDING ORDER ON
## MANAGEMENT OF SOCIAL SECURITY CASES

In light of the Federal Rules of Civil Procedure Supplemental Rules for Social Security Actions Under 42 U.S.C. § 405(g), which will become effective on December 1, 2022, the Court's previous Standing Order on Management of Social Security Cases (Doc. 43) will terminate and not be applicable to any social security cases filed on or after **December 1, 2022**.

**DONE AND ORDERED** in Jacksonville, Florida this 22nd day of November, 2022.



TIMOTHY J. CORRIGAN
**Chief United States District Judge**

1       Plaintiff Lincoln Network, Inc. ("Lincoln Network" or "Plaintiff") brings
2  this class action complaint on behalf of itself and those similarly situated
3  (collectively, "Plaintiffs") against Defendants PNC Financial Services Group, Inc.
4  ("PNC FSG") and PNC Bank, National Association ("PNC Bank") (collectively,
5  "PNC" or "Defendants"). Plaintiff alleges the following based upon its information
6  and belief and the investigation of its counsel and personal knowledge as to the
7  allegations pertaining to it.

8  **I.   INTRODUCTION**
9       1.    Defendant PNC Bank has exploited the Coronavirus crisis to line its
10  pockets with hundreds of millions of taxpayer dollars while compounding the
11  economic hardship suffered by small businesses and independent contractors—
12  "hardworking Americans and businesses that, through no fault of their own, have
13  been adversely impacted by the coronavirus outbreak," according to U.S. Treasury
14  Secretary Steven Mnuchin.
15       2.    The U.S. Small Business Administration ("SBA") Paycheck
16  Protection Program ("PPP") was intended to help "overcome the challenges" of
17  the Coronavirus crisis and "provide a direct incentive to small businesses to keep
18  their workers on the payroll" by providing SBA-guaranteed loans of up to $10
19  million to qualified applicants.[1] Anticipating the massive demand for relief and to
20  ensure non-preferential distribution of funds, the PPP's governing rules required
21  that banks process applications on a "*first-come, first-served*" basis.[2]
22       3.    In violation of these rules, California law, and their fiduciary
23  obligations, Defendants favored their own interests by prioritizing larger loan

---

[1] https://www.sba.gov/funding-programs/loans/coronavirus-relief-options/paycheck-protection-program-ppp#section-header-4 (last visited April 22, 2020).

[2] https://www.sba.gov/sites/default/files/2020-04/PPP--IFRN%20FINAL_0.pdf (last visited April 22, 2020).

1   meant that PNC and other banks did less work to vet applications than for
2   traditional SBA or other loans.
3       7.      PNC FSG recently highlighted its participation in the PPP during its
4   quarterly earnings conference call with analysts and investors on April 15, 2020.
5   During the call, CEO William Demchak claimed the bank was "[h]elping
6   thousands of business customers apply for emergency relief loans," "providing
7   relief to customers," and "[c]ontinuing to provide liquidity to corporate clients."
8   Selected slides accompanying Mr. Demchak's discussion of the bank's business
9   are below:



government puts more money in we can submit." On April 18, 2020, PNC claimed without explanation that it was "unable to complete the review and SBA registration process" for Lincoln Network's PPP loan application "before the SBA announced on its website that it is unable to accept new applications for the PPP program because the authorized funding has been fully allocated."

11.    At no time did PNC disclose and Plaintiff was unaware that PNC was violating the PPP governing rules by favoring existing PNC customers and applicants seeking larger loans and putting smaller borrowers like Lincoln Network to the back of the queue or not submitting their application at all.

12.    As of the date of this Complaint, Plaintiff and other members of the proposed Class have suffered enormous and potentially irreversible damages. For example, unlike those favored by PNC and other big banks, Plaintiff and other Class members have not received funds or approval of their loan applications. Additionally, the delay caused by PNC's misrepresentations and omissions caused hardship, including business cessation, for many applicants who were and are desperately seeking a lifeline through the PPP.

13.    Through this litigation, Plaintiff seeks an injunction preventing PNC from continuing its illegal business practices, compensation for the harms caused by misconduct alleged herein, and all other relief that the Court deems appropriate.

## II.    THE PARTIES

### A.    Plaintiff

14.    Plaintiff Lincoln Network, Inc. is a 501(c)(3) tax exempt organization incorporated in Delaware with its primary business address at 2443 Fillmore Street, #380-3386, San Francisco, CA 94115.

15.    Lincoln Network's mission is to build a community of innovators who embrace technology and educate the public about platforms and policies that advance liberty. In particular, Lincoln Network is dedicated to increasing

84.    Additionally, Defendants must comply with SBA regulations such as 13 CFR Part 120.140, which states, among other things, that lenders "must act ethically and exhibit good character" that prohibits "engag[ing] in conduct reflecting a lack of business integrity or honesty." 13 CFR Part 120.140(f); *see also* 13 CFR Part 120.140(b), (j)(1), (l).

85.    Defendants' violations of such statutes is negligence per se and was a substantial factor in the harm suffered by Plaintiff and the Class members, including their submission of applications for loans through the PPP with Defendants who violated the "first-come, first-served" basis for processing loan applications, as dictated by the PPP, when they processed larger loans ahead of smaller loans.

86.    As set forth above, such laws were intended to ensure that a company's claims about its services are truthful and accurate and that they engaged in business in an ethically and honest manner.

87.    By virtue of Defendants' negligence, Plaintiff and the Class members have been damaged in an amount to be proven at trial or alternatively, seek rescission and disgorgement under this Count.

## VI.    **DEMAND FOR JURY TRIAL**

88.    Plaintiff demands a trial by jury on all issues so triable.

## VII.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for the following for relief:

1.    Certifying the proposed Class; appointing Plaintiff as Class representative, and its undersigned counsel as Class counsel;

2.    An order requiring Defendants to bear the costs of class notice;

3.      An order enjoining Defendants from administering, processing, or handling loans through the PPP in violation of SBA regulations and requirements or California law;

4.      An order awarding declaratory relief, and any further retrospective or prospective injunctive relief permitted by law or equity, including enjoining Defendants from continuing the unlawful practices as alleged herein, and injunctive relief to remedy Defendants' past conduct;

5.      An order requiring Defendants to disgorge or return all monies, revenues, and profits obtained by means of any wrongful or unlawful act or practice;

6.      An order requiring Defendants to pay punitive damages on any count so allowable;

7.      An order requiring Defendants to pay all statutory damages permitted under the counts alleged herein;

8.      An order awarding attorneys' fees and costs, including the costs of pre-suit investigation, to Plaintiff and the Class members; and

9.      An order providing for all other such equitable relief as may be just and proper.

Date: April 23, 2020                    Respectfully submitted,

                                        BERGER MONTAGUE PC

                                        */s/ Benjamin Galdston*
                                        BENJAMIN GALDSTON
                                        12544 High Bluff Drive, Suite 340
                                        San Diego, CA 92130
                                        Tel: (619) 489-0300
                                        Email: bgaldston@bm.net

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BRYSON LAW PLLC
Daniel K. Bryson
(*pro hac vice* forthcoming)
PO Box 12638
Raleigh, NC 27605
Tel:  (919) 600-5000
Fax:  (919) 600-5035
Email: dan@whitfieldbryson.com


LOCKRIDGE GRINDAL NAUEN P.L.L.P.
Robert K. Shelquist
(*pro hac vice* forthcoming)
Rebecca A. Peterson (SBN 241858)
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel.: (612) 339-6900
Fax: (612) 339-0981
Email: rkshelquist@locklaw.com
             rapeterson@locklaw.com


GREG COLEMAN LAW PC
Alex R. Straus (SBN 321366)
16748 McCormick Street
Los Angeles, CA 91436
Tel.: (310) 450-9689
Email:  alex@gregcolemanlaw.com
             -and-
Gregory F. Coleman
(*pro hac vice* forthcoming)
First Tennessee Plaza
800 South Gay Street, Suite 100
Knoxville, TN 37929
Tel.: (865) 247-0080
Email: greg@gregcolemanlaw.com

*Attorneys for Plaintiff*
*and the Proposed Class*

CLASS ACTION COMPLAINT



TORTORIELLO
15301 Cortena Way
Naples, Florida 34120

CPU

U.S. POSTAGE IMI
$3.07
FCMF   RDC 99
Orig: 34119
Dest: 32601
01/24/24
2000052493

TO:
Northern District Court
Florida
US Courthouse
401 SE First Avenue
Gainsville, Fl. 32601
Attn: Administration of Court

(COURT DOCUMENTS)

Urgent
Confidential